OPINION OF THE COURT
F. Dana Winslow, J.
In a proceeding pursuant to CPLR article 78, the petitioner *643 AEP Resources Service Company’s (AEP) application by way of order to show cause seeking an order annulling the award by the Long Island Power Authority (hereinafter LIPA) to Hydro-Quebec doing business as Transenergie US, Ltd. (hereinafter Transenergie), setting aside any contract entered into between LIPA and Transenergie pursuant to the foregoing award, directing LIPA to award the public contract to them, or in the alternative, directing LIPA to revise the request for proposals (RFP) to exclude the construction phase of this contract and, for a preliminary injunction pursuant to CPLR 7805 staying, during the pendency of this hybrid proceeding, all actions in furtherance of the contract, and directing certain disclosure, and examinations under oath, is determined as follows:
LIPA published a request for proposals dated January 14, 1998 for the evaluation, design and construction of an off-island electrical transmission system for Long Island. The RFP was composed of two parts: one required an evaluation of the technical, economic and environmental feasibility of an electrical transmission system connecting Long Island with the “grid” in New York and New England (the evaluation phase), and the other contemplated the development and construction of the subsea cable system for the transmission of power to Long Island from “off-island” sources (the construction phase). LIPA used a competitive bidding process which required all bidders to pay a $10,000 fee upon submission of a proposal, which was to be used to offset the costs of evaluating the proposals. The RFP required separate prices for each phase of the RFP, with LIPA reserving the right to award more than one evaluation phase contract.
LIPA’s intention was to investigate alternative off-island sources of energy and decide whether or not to proceed with the construction phase of the RFP. In the event that the construction phase were not pursued, LIPA would then reimburse the awardee(s) the cost of the evaluation portion of the contract but if it were, the evaluation fee would merge into the construction contract. If LIPA were to proceed with the construction phase of the contract, the awardee of the evaluation phase would also then be awarded the construction contract. The construction phase of the RFP contemplated a substantially greater cost then the evaluations, a cost of approximately 100 times greater than that of the evaluation phase. The evaluation awardee would be permitted to unilaterally decline the construction contract without damages if the *644 original construction cost, as determined in the evaluation, were in excess of the bid estimates. LIPA would then be free to pursue alternative awardees or award the contract for the increased costs.
Three bids were submitted in response to the RFP. The petitioner submitted what was facially the lowest bid, and the respondent Transenergie, which was awarded the contract, submitted a bid that was $7, $31, $40, or $46 million higher depending upon variables in the calculation. Both Transenergie and AEP were found to be responsible bidders, and both submitted proposals of approximately $2,000,000 for the evaluation phase of the contract. AEP submitted a proposal for the construction phase of the project totaling approximately $157,000,000 and the respondent Transenergie submitted a proposal ranging between $179,000,000 and $203,000,000. The proposals were not identical and each involved differences requiring considerable expertise to evaluate. The third response, although the bidder is not a party, bears consideration because of its extremes. ENRON bid $1 for the evaluation phase and approximately $407,000,000 for the construction phase.
AEP makes the following claims. First, that LIPA’s action was contrary to law, including Public Authorities Law § 1020-cc, which subjects LIPA to the requirements of General Municipal Law § 103 and the State Finance Law, and in turn to certain filing requirements with the New York State Attorney-General and the Public Authorities Control Board (hereinafter PACE). Second, that LIPA acted arbitrarily and capriciously in failing to award the contract to AEP, ostensibly the lowest bidder. Third, that LIPA illegally granted a right of first refusal for the construction phase of the contract to Transenergie. Fourth, that LIPA breached an implied contract in failing to invest a level of effort in its evaluation of AEP’s bid commensurate with the amount paid ($10,000).
As a consequence, AEP seeks (1) a preliminary and permanent injunction enjoining LIPA from awarding a contract under the RFP to any concern other than AEP and/or from allowing performance under any contract awarded under the RFP to any concern other than AEP; (2) a declaratory judgment that (a) LIPA’s award of the RFP to Transenergie was contrary to law, arbitrary and capricious and is null, (b) AEP is the only appropriate awardee, (c) Transenergie is disqualified from receiving an award under this RFP, (d) denies a right of first refusal to Transenergie to perform the construction phase of *645 the contract as unlawful and void, and (e) declares LIPA breached its implied contract with AEP to devote effort in the evaluation of AEP’s proposal commensurate with the $10,000 fee paid; (3) an order setting aside any award to Transenergie and directing LIPA to award a contract under the RFP to AEP, or, in the alternative, directing LIPA to revise the RFP, solicit new proposals and to reevaluate those offers consistent with the revised RFP, together with the costs of this action, including attorney’s fees and expenses. AEP also seeks a temporary restraining order prohibiting LIPA from executing a contract reflecting the award of the Transenergie bid. The court notes that an agreement was reached during oral argument, and subsequent thereto, to the effect that LIPA will not execute a contract with Transenergie for a stated period which coincides with the publication of this determination.
The respondents oppose AEP’s application for preliminary injunctive relief, contending that the RFP called for the performance of services involving special skills and professional training and thus was outside the scope of the competitive bidding statutes, that the evaluation was sound, rationally based and wholly supported by the record, and AEP cannot meet the requirements for the injunctive relief sought.
STANDING
As a preliminary matter, Transenergie contests AEP’s standing to challenge LIPA’s statutory power to contract without approval from the PACE and standing to challenge LIPA’s violation of State Finance Law § 112 for failing to obtain approval from the New York State Comptroller (Comptroller) on the grounds that AEP is a citizen of Ohio, not New York. While LIPA does not directly contest AEP’s standing to challenge the contract pursuant to General Municipal Law § 103, LIPA’s position that the .contract was, in essence, one for specialized professional services and that, as such, was not subject to General Municipal Law § 103, also presents a threshold issue for consideration.
While the court recognizes the importance placed upon the resolution of this project by the litigants and the potentially profound effects on the public likely to ensue therefrom, the determination regarding standing must be based on something more than that “an issue may be one of ‘vital public concern’ ” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769). Since LIPA is a New York legislative creation (Public Authorities Law art 5, tit 1-A, §§ 1020 — 1020-hh), an examina *646 tion of the plain meaning of the statute is an appropriate first consideration. Public Authorities Law § 1020-f (a) provides for a general waiver of sovereign immunity and section 1020-cc states: “[a] 11 contracts of the authority shall be subject to the provisions of the state finance law relating to contracts made by the state * * * The authority shall let contracts for construction or purchase of supplies, materials, or equipment pursuant to section one hundred three and paragraph (e) of subdivision four of section one hundred twenty-w of the general municipal law.” Although not maintained by the parties, section 1020-c (1) resolves any doubt raised regarding the status of the LIPA entity providing “there is hereby created a corporate municipal instrumentality of the state to be known as the ‘Long Island power authority’, which shall be a body corporate and politic and a political subdivision of the state, exercising essential governmental and public powers”. Additionally, in evaluating the statutes applicable herein, section 1020-ff provides that title 1-A, “shall be liberally construed to effect the purposes hereof’.
The provisions of the Public Authorities Law pertaining to LIPA contain no specific authority for “citizen suits” nor do any other Public Authorities Law provisions provide statutory standing for the plaintiffs. Accordingly, the court must look to case authority and the other provisions of the Public Authorities Law in applying the State Finance Law and General Municipal Law to determine whether or not AEP has standing (see, e.g., Giuliani v Hevesi, 228 AD2d 348). In addition, in order to establish standing the petitioners must show that the injury complained of falls within the “zone of interests” sought to be protected by the relevant statutory provision applicable to LIPA, and further that there is “no clear legislative intent negating review” (Matter of Corbett v New York State Thruway Auth., 204 AD2d 542, 543; Society of Plastics Indus. v County of Suffolk, 77 NY2d, supra, at 773; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, 415; Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 11).
AEP challenges LIPA’s award of the contract to Transenergie pursuant to Public Authorities Law § 1020-f (aa), which mandates that LIPA “ [n] otwithstanding any other provision of law to the contrary * * * shall not undertake any project without the approval of the public authorities control board”. A “project” is defined in Public Authorities Law § 1020-b (12-a) as an action undertaken by the authority that, inter alia, commits the authority to a contract or agreement with a total consider *647 ation of more than $1 million and does not involve the day-today operations of the Authority.
In contrast, LIPA maintains that this award is exempt from PACE review as it does involve LIPA’s day-to-day operations. The court rejects this contention; the contract is clearly a “project” within the meaning of the statute. While the court does not dispute that an undersea cable system will operate daily, it does not follow that the award of the contract in issue involves LIPA’s day-to-day operations. Clearly, the awarding of a $200 million construction contract is not something LIPA does day-to-day nor does it constitute part of such day-to-day operations of LIPA so as to be excluded from the statutory definition of “project” and thus be exempt from PACE review. Were LIPA’s interpretation of Public Authorities Law § 1020-b accurate, then few, if any, contracts would be reviewable by the PACE, clearly an unintended result.
Since LIPA is a public entity subject to the Public Authorities Law, standing must be determined in the context of the Public Authorities Law. Public Authorities Law § 1020-f (aa) establishes four criteria for PACE review of contracts such as are at issue. Among these is the financial feasibility of a qualifying contract, that is, whether the contract would materially adversely affect overall real property taxes in the service area and whether the project is anticipated to result in lower utility rates. If, as contended by AEP, its bid was millions of dollars lower than the LIPA award, the selection of the higher bid would clearly affect the financial feasibility of the project and would have an affect on the utility rates in the service area. The court finds that additional expenditures of $22,000,000 to $46,000,000, based on a potentially higher bid, whether in the form of a merchant contract or capitalized by LIPA, will ultimately effect the ratepayers. If this power project results in a merchant contract (see, infra), with the ultimate awardee, then the toll charges for the use of the undersea lines will be greater. If the project is capitalized by LIPA then the LIPA service rates will reflect this cost and will increase. In either event, the increased costs associated in awarding the higher bid would have to be recaptured.
The PACE’s substantial role in the approval of “projects” is amply illustrated by the PACE’s role in LIPA’s acquisition of the Long Island Lighting Company and particularly by the five conditions the PACE imposed upon LIPA in approving that project (see, e.g., Suffolk County v Long Is. Power Auth., 177 Misc 2d 208 [Sup Ct, Nassau County 1998]). Therefore, the *648 PACE has the statutory obligation to review the Transenergie bid. LIPA’s failure to adhere to this statutory obligation has a direct effect on AEP. Inasmuch as AEP’s bid qualifies as a project under Public Authorities Law § 1020-b (12-a) it has suffered an “injury in fact” by LIPA’s omission, and falls within the zone of interests sought to be protected by the statutes creating the PACE. AEP’s interest is different in kind from the public at large (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, supra). The sheer size, economic and technological, of the proposed construction and its effect on AEP’s finances and credibility in the industry clearly argues for an interest distinct from that of the public’s.
AEP further challenges LIPA’s failure to seek and receive approval from the New York State Comptroller pursuant to State Finance Law § 112 with the commensurate response that AEP lacks standing. Similar to the PACE, the Comptroller sits as a watchdog over the awarding of contracts, by any State agency, which exceed $10,000. The strong language set forth in the legislative purpose (State Finance Law § 123) of the statute makes clear the interest individuals have in the proper disposition of all State funds and provides for direct citizen suits. Any citizen-taxpayer is provided a right to seek the remedies provided in State Finance Law § 123 et seq. as these terms are defined (see, State Finance Law § 123-a). While the petitioner AEP is an Ohio corporation, and does not allege status as a citizen-taxpayer, the issue once again emerges as to whether AEP has established “injury in fact” that “is in some way different from that of the public at large” (Society of Plastics Indus. v County of Suffolk, supra, at 774). Additionally, there is “no clear legislative intent negating review” in the State Finance Law (Matter of Corbett v New York State Thruway Auth., 204 AD2d 542, 543, supra; Society of Plastics Indus. v County of Suffolk, 77 NY2d, supra, at 773; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, 415, supra; Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 11, supra; see, cf., Giuliani v Hevesi, 228 AD2d 348, supra).
In evaluating AEP’s standing to bring a cause of action pursuant to State Finance Law § 112 an understanding of the interests protected by the statute is, thus, essential (see, e.g., Matter of Corbett v New York State Thruway Auth., 204 AD2d 542, supra). While on its face State Finance Law § 112 protects the public fisc, equally clear is that the Comptroller’s review also includes oversight of material and substantial irregularities which may undermine the fairness of competition in the *649 bidding process which, in turn, may have an effect on the prudent and economical use of public monies (see, Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148). Given this recognized tie between the prudent and economical use of public monies and the stated purposes of the State Finance Law, AEP’s interests as an unsuccessful bidder alleging irregularities afford it standing (see, Matter of Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d 48; Matter of Amdahl Corp. v New York State Higher Educ. Servs., 203 AD2d 792). Transactive and Amdahl, both CPLR article 78 proceedings, hold that an unsuccessful bidder, in each case the appellant-petitioner, had standing to challenge the agency’s act pursuant to provisions of the State Finance Law. The Amdahl Court stated “that the award of contracts for a public project 'is a matter of acknowledged public interest which relieves the petitioner of the obligation to show that it is an aggrieved party or that it has any special interest’ ” (supra, at 794, citing Elia Bldg. Co. v New York State Urban Dev. Corp., 54 AD2d 337, 342). “In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption” (Matter of Fischbach & Moore v New York City Tr. Auth., 79 AD2d 14, 19). These are obvious concerns of a disappointed bidder, establishing AEP as an aggrieved party falling within the “zone of interests” sought to be protected by the State Finance Law. The court finds that the Transactive challenges of State Finance Law § 163 (9) (b), which provides that a solicitation must describe and disclose the general manner of the evaluation to be conducted, and section 163 (7), which requires a State agency to document the determination of the evaluation criteria, cannot be distinguished, for the purposes of determining standing to challenge, from the instant challenge to State Finance Law § 112 by AEP.
AEP additionally maintains that General Municipal Law § 103 applies. This statute, however, was enacted to protect municipalities and their taxpayers, not to benefit disappointed bidders. An unsuccessful bidder is not entitled to recover the profits it might have made from a municipality, had its bid been accepted (Stride Contr. Corp. v Board of Contract & Supply, 181 AD2d 876, 879). Nonetheless, AEP, as a bidder, may be a proper party to challenge LIPA for its alleged failure to comply with the statutory mandate to award the bid to the lowest responsible bidder (General Municipal Law § 103 [1]). To establish standing to challenge an administrative action a *650 party must show “injury in fact” that “is in some way different from that of the public at large” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 774, supra). If, as contended, LIPA has failed to award the bid to the lowest responsible bidder and the instant contract falls within the ambit of General Municipal Law § 103, AEP has suffered an “injury in fact” and is within the zone of interests sought to be protected by this section. As a bidder, these injuries would be different from those suffered by the public at large (Stride Contr. Corp. v Board of Contract & Supply, 181 AD2d 876, supra; Woods Adv. v Koch, 178 AD2d 155).
RELIEF SOUGHT
Having determined that the petitioner AEP has standing to challenge LIPA pursuant to General Municipal Law § 103; Public Authorities Law § 1020-f (aa); § 1020-cc and State Finance Law § 112, the court now turns to a consideration of the relief sought in this application.
AEP seeks a preliminary injunction and temporary restraining order, during the pendency of this matter, enjoining LIPA from proceeding further with the processing of the Transenergie bid, including the execution of any contact in connection with the RFP and/or the performance of such contract, and directing LIPA to produce a list of documents for inspection and examination under oath of Richard Bolbrock (LIPA’s lead project evaluator) and Ronald Nichols (an employee of Resource Management International, Inc., part of LIPA’s bid evaluation team). “To obtain a preliminary injunction a movant must demonstrate (1) a likelihood of ultimate success on the merits; (2) danger of irreparable harm unless the injunction is granted; and (3) a balance of the equities in its favor” (see, Nelson v Jannace, 248 AD2d 448, 449 [2d Dept 1998]; Aetna Ins. Co. v Capasso, 75 NY2d 860, 862).
LIKELIHOOD OF ULTIMATE SUCCESS
General Municipal Law
The heart of LIPA’s contention regarding AEP’s likelihood of success on the merits is that LIPA properly exercised its discretion in awarding Transenergie the contract. LIPA asserts that it was not required to award the contract to AEP solely based on its lowest bid so long as that decision is supported by a rational basis. In support of this assertion, LIPA cites “the long-standing exception to the competitive-bidding requirements of State law in that it calls for services whose proper performance requires scientific knowledge or profes-
*651 sional skills” (see, Matter of Burroughs Corp. v New York State Higher Educ. Servs. Corp., 91 AD2d 1078, 1079; People ex rel. Smith v Flagg, 17 NY 584). In the court’s view the evaluation phase of LIPA’s RFP is substantially similar to that in Burroughs (supra), in requiring specialized scientific knowledge and professional skills. Thus LIPA’s consideration of the enumerated factors, in addition to its consideration of cost, in awarding the evaluation phase of the contract, was appropriate and necessary.
AEP notes that even LIPA found it to be a responsible bidder, which, under the circumstances, indicates that it possessed the specialized scientific knowledge and professional skills necessary for the performance of the contract in question. AEP raises four areas in which it contends LIPA arbitrarily determined that Transenergie’s bid was preferable: (1) the costs of the two bids were similar when all considerations of expected additional costs were included; (2) the New England and New York power pools “preferred” Transenergie’s technology and therefore the technology proposed by AEP would or might delay construction; (3) the environmental impact of Transenergie’s system would be less and therefore require less time to consider; and (4) LIPA wrongfully changed the RFP to require a connection to the Shoreham property. The affidavit of Ronald Nichols and James Nash addresses the points raised by AEP and explains the underpinnings of LIPA’s determination to award the contract to Transenergie. Respecting the cost comparisons for the two systems, Nichols explained the rationale for adding expected costs to AEP’s proposal of connecting at Devon, Connecticut, including the reinforcements needed there and the probable need for either increased generation capacity and/or transmission capacity at that location in order to accommodate Long Island’s anticipated electric needs.
LIPA further explained the rationale behind LIPA’s preference for the technology proposed by Transenergie and the relative newness of the technology proposed by AEP. The essence of the disagreement is: AEP proposes to use “state of the art” technology which, in turn, primarily utilizes long tested and approved components. AEP believes that its alternating current (AC) system, already in use in another community, will prove as reliable as, but less expensive than the more generally accepted and widely used direct current (DC) Transenergie system. While AEP may debate the relative strengths of each system, the court’s obligation is to ascertain whether the decision was based on sound discretion supportable by evidence in *652 the record. The court concludes that it cannot and will not substitute its judgment for that of respondent LIPA in this administrative determination. “Although the power to reject any or all bids may not be exercised arbitrarily or for the purpose of thwarting the public benefit intended to be served by the competitive process [citations omitted], the discretionary decision ought not to be disturbed by the courts unless irrational, dishonest or otherwise unlawful” (Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 149, supra). Here it appears that LIPA’s determination concerning the technology to be used in the evaluation phase of the contract, though conclusory, was not irrational, and clearly not dishonest or otherwise unlawful under General Municipal Law § 103. Accordingly, AEP’s ultimate likelihood of success on the merits of this issue is less than apparent. However, as will be further discussed, this conclusion is not determinative of the AEP claim.
While the court understands and appreciates LIPA’s need to expedite the resolution of the anticipated energy shortfalls for its service area by the year 2002, it appears that the linking of the evaluation phase of the project and the construction phase is not supportable in reason or law. Under LIPA’s RFP the awardee of the evaluation phase of the contract would design and evaluate a proposal to supply energy to the Shore-ham connection site on Long Island. This evaluation would include, inter alia, firm costs and a construction timetable for the completion of the project, should LIPA elect to proceed with construction. Thus, according to LIPA’s scheme, it was not obligated to proceed and construct this undersea cable system. LIPA’s determination to proceed was to be based upon an evaluation of the alternative cost and timetable to provide on-island generation facilities capable of meeting the anticipated power demands. Concomitantly, the awardee would not be obligated to proceed with construction of the project if, in its own discretion, as a result of the evaluation, it determined that its initial cost estimate could not be met. It is apparent that neither party would be under an obligation to proceed with the actual construction of the project. Therefore, so much of the RFP as contemplated construction is unenforceable and illusory. LIPA has structured the construction phase of the contract without mutual obligation, rendering it illegal and unenforceable (see, Scalia v Equitable Life Assur. Socy., 251 AD2d 315; Saccente v Lexington School for Deaf, 228 AD2d 575).
*653 LIPA’s goal to expeditiously obtain additional power cannot justify the circumvention of its unambiguous statutory mandate to let contracts for construction pursuant to General Municipal Law § 103 (see, Public Authorities Law § 1020-cc). The simple expedient of tying a construction contract, which requires governmental approvals and which is of dubious enforceability, to an evaluation contract which appears, at least facially, to depend on specialized and professional services, cannot be used as the new magic formula by State agencies to avoid the public bidding process requirements. Additionally, the court concludes that so much of the award as relates to the actual construction of this project must be separated from the award for the evaluation phase of the contract, and new construction RFPs be issued as described hereafter.
IRREPARABLE HARM
AEP clearly suffers irreparable harm if denied the award of the evaluation phase. In fact, other than injunctive and declaratory relief AEP has no remedy at law. It is well established that General Municipal Law § 103 was primarily enacted to protect municipalities and their taxpayers, not to benefit disappointed bidders. An unsuccessful bidder is not entitled to recover the profits it might have made had its bid been accepted by the State or a municipality (Stride Contr. Corp. v Board of Contract & Supply, 181 AD2d 876, 879, supra; Woods Adv. v Koch, 178 AD2d 155, supra). Thus, absent prevailing on an injunction and in this declaratory action, AEP would have no recourse and its inability to showcase its technology in the Long Island venue would be a significant set back to its use of cutting-edge developments and a loss to the ratepayers of Nassau and Suffolk Counties, for at least a fair airing of new scientific advances.
BALANCING THE EQUITIES
An assessment of the equities is, at best, difficult. Petitioner correctly notes that the Legislature has considered the urgency of LIPA’s legislated goals. AEP’s strongest argument is that the proposed Transenergie contract be submitted to both the PACE and the Comptroller’s office for approval. AEP also notes that it and the public have an interest in AEP’s being able to compete on an equal basis in the bidding process (see, e.g., Northeastern Fla. Ch., Associated Gen. Contrs. v Jacksonville, 508 US 656 [holding that the injury prong of the standing test was satisfied by plaintiff’s showing that it was prevented from *654 competing on an equal basis for the contracts at issue]). The AEP/Transenergie equanimity would be lost if Transenergie were permitted to submit an evaluation without AEP having the opportunity to perform its own evaluation and the court views the maintenance of parity between the bidders of significant importance. In considering the RFP, the court has divided the proposal into two parts, evaluation and construction, and determined that the construction phase is void and unenforceable as previously described. Allowing AEP to participate equally in the evaluation phase is of paramount concern to determine the advisability of utilizing new technology at a lower cost. If, as LIPA contends, the efficacy of the evaluation phase depends upon obtaining accurate construction cost assessments, in the initial response to the RFP, the court’s separation of the two phases may reduce the utility of the evaluation phase.
In contrast, LIPA, through its experts, has demonstrated that significant harm is likely to ensue should the ultimate construction of either on-island or off-island energy sources be delayed and should LIPA therefore be unable to provide the Island’s energy needs as mandated. Accepting LIPA’s contention concerning the urgency of the need as true, and accepting LIPA’s contention that AEP’s technology may not be accepted by the electrical utility community, the court is unable to conclude that the equities are in either AEP’s or Transenergie’s favor. However, this determination does not conclude the court’s consideration of the balancing of the equities. The welfare of the Nassau-Suffolk ratepayers has not been included in the equation that was presented. Their best interest would be served and the equities balanced if AEP were given the opportunity to complete and submit the evaluation phase of the RFP. LIPA can clearly benefit from the submission of an additional study, particularly since it may be persuaded that the AEP or alternating current (AC) technology is acceptable to the New York-New England grid, is less expensive, better or equal to the Transenergie direct current (DC) technology, and does not exceed the Transenergie environmental impact or anticipated completion time. The ratepayers will benefit from LIPA’s consideration of an alternative bidder with significantly different technology at arguably less cost. The oral argument record was replete with offers to reduce the compensation to be received by AEP for an evaluation phase award but with equal or greater emphasis on the need to proceed only if it had LIPA’s cooperation. However, the court would not, even if it could, *655 require LIPA to pay more than the $2 million payable to Transenergie. Therefore, AEP may proceed without compensation with an independent evaluation in accordance with the evaluation phase of the RFP. AEP and Transenergie shall receive most of what they sought and hopefully the Long Island ratepayers shall be the ultimate beneficiaries of this determination.
Accordingly, the petitioner-plaintiffs motion is granted and the award by LIPA to Transenergie is hereby annulled and any contract relating to the RFP is hereby set aside, unless Transenergie determines to proceed under a contract pursuant to the RFP as modified by this decision to the extent of severing any construction award or option described as the construction phase, but otherwise on the original terms as bid, except that LIPA provides full and equal cooperation with AEP, should AEP seek to conduct an independent evaluation at its own expense but otherwise under the same terms available to Transenergie and unless LIPA consents to the RFP as modified and to AEP’s participation as described herein.
So much of the petitioner-plaintiffs application as sought injunctive relief and an order directing LIPA to produce certain documents for discovery and inspection and to examine individuals under oath is denied, as moot. The remaining relief sought by plaintiff-petitioner is denied.